# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RANDALL J. GROSS,                    )
                                     )
                    Plaintiff,       )
                                     )        CIVIL ACTION
v.                                   )
                                     )        No. 11-1256-JWL
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
                    Defendant.       )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying disability insurance benefits (DIB) and supplemental security income (SSI) under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding error in the Commissioner's consideration whether Plaintiff's condition meets or equals Listing 12.05C for Mild Mental Retardation, the court ORDERS that the decision is REVERSED, and that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) REMANDING the case for further proceedings consistent herewith.

## I.    Background

Plaintiff applied for both DIB and SSI on August 22, 2008, alleging disability beginning June 21, 2006.  (R. 13, 90-98).  The applications were denied initially and upon

reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 13, 41-44, 58-59). Plaintiff's request was granted, and Plaintiff appeared with counsel for a hearing before ALJ George M. Bock on April 22, 2010. (R. 13, 22). At the hearing, testimony was taken from Plaintiff and from a vocational expert. (R. 13, 27-39).

ALJ Bock issued his decision on July 13, 2010 finding that Plaintiff has severe impairments of low average IQ and degenerative disc disease, but that he has no impairments or combination thereof which meet or medically equal the severity of a listed impairment. (R. 15-17). He found that Plaintiff has the residual functional capacity (RFC) to perform a range of light work, limited by his mental condition to "one to two-step jobs with no complex or intermediate tasks or instructions." (R. 17). In assessing RFC, the ALJ found that Plaintiff's allegations of symptoms resulting from his impairments are not credible, and he accorded "great weight" to the opinions of Dr. Fortune, a nontreating physician who had performed a physical examination of Plaintiff, and "some weight" to the opinions of Dr. Adams, the nonexamining state agency psychologist who had reviewed the medical evidence, which included Dr. Mintz's report. (R. 18). Earlier in the decision, while assessing step three of the sequential evaluation process, the ALJ noted that he accorded "little weight" to the opinions expressed in the report of Dr. Mintz, a nontreating psychologist who performed a psychological examination and intelligence testing of Plaintiff at the request of the agency. (R. 16).

The ALJ found that Plaintiff is unable to perform his past relevant work based upon the RFC assessed, but that, considering Plaintiff's age, education, work experience,

and the RFC assessed, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 19). He therefore determined that Plaintiff has not been disabled within the meaning of the Act, and denied the applications for benefits. (R. 20).

Plaintiff requested Appeals Council review of the ALJ's decision, and submitted additional medical evidence for the Council's review. (R. 7-9, 378-83). The Appeals Council issued an order making the additional medical evidence a part of the administrative record in the case and considered that evidence, but found no reason under Social Security Administration (SSA) rules to review the ALJ's decision, denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 1-4); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006). Plaintiff timely filed this case, seeking judicial review of the decision. (Doc. 1).

## II.     Legal Standard

The court's jurisdiction and review are guided by the Act. Weinberger v. Salfi, 422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d 1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C. § 405(g)). Section 405(g) of the Act provides for review of a final decision of the Commissioner made after a hearing in which the Plaintiff was a party. It also provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine

3

whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such evidence as a reasonable mind might accept to support a conclusion. Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least twelve months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)); see also, Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)). The claimant's impairments must be of such severity

4

that he is not only unable to perform his past relevant work, but cannot, considering his age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step sequential process to evaluate disability.  20 C.F.R. §§ 404.1520, 416.920 (2010); Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining whether claimant can perform past relevant work; and whether, considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on claimant to prove a disability that prevents

performance of past relevant work.  Blea, 466 F.3d at 907; accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy within Plaintiff's capability.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims that the ALJ erred in failing to find that his condition meets or medically equals Listing 12.05C, and that the ALJ did not base his RFC assessment on all of the record evidence or link the RFC assessed to record evidence.  The Commissioner argues that the ALJ properly determined Plaintiff's condition does not meet or medically equal Listing 12.05C and that the ALJ properly assessed Plaintiff's RFC.  The court finds that remand is necessary because the ALJ did not properly consider whether Plaintiff's condition meets or medically equals the criteria of Listing 12.05C at step three of the evaluation process.  Because remand is necessary due to the step three error, the court will not consider whether the Commissioner properly assessed Plaintiff's RFC after evaluating step three.  Plaintiff may make his arguments in that regard, if necessary, to the Commissioner on remand.

### III.    Consideration of Listing 12.05C at Step Three of the Evaluation Process

Plaintiff notes that Dr. Mintz evaluated Plaintiff's mental condition and tested his IQ using the Wechsler Adult Intelligence Scale - III (WAIS-III); that the testing resulted in IQ scores of 64 for Full Scale IQ, 66 for Verbal IQ, and 70 for Performance IQ; that Dr. Mintz found the test results valid; and that he found Plaintiff functioned in the mild mentally retarded range and diagnosed Plaintiff with mild mental retardation.  (Pl. Br. 11-

12) (citing (R. 273-77); and <u>McKown v. Shalala</u>, No. 93-7000, 1993 WL 335788, *2

(10th Cir. Aug. 26, 1993)).  Plaintiff argues that the ALJ discounted the diagnosis of mild

mental retardation because he erroneously found both that Plaintiff's activities and

functioning over time did not support the diagnosis and that "Gross's 'adaptive

functioning [wa]s much higher th[an] his October 2008 IQ scores show, which suggests

the scores [were] invalid.' ".  <u>Id.</u> at 12 (quoting (R. 17); and citing (R. 18)) (brackets in Pl.

Br.).  Plaintiff argues that the ALJ did not point to record evidence showing Plaintiff can

function at a higher level, and did not support this conclusion with specific citation to

other medical opinions.  <u>Id.</u>  Finally, Plaintiff claims the ALJ did not discuss whether he

"met or equaled the second portion of Listing 12.05 for the additional mental or physical

limitation that would cause significant work-related limitations."  <u>Id.</u>

    The Commissioner argues that the ALJ found that "Plaintiff did not meet the

criteria for Listing 12.05C because he did not proffer evidence demonstrating an onset of

mental retardation before age 22, and he lacked a physical or other mental impairment

imposing an additional and significant work-related limitation of function."  (Comm'r Br.

10) (citing (R. 16-18)).  He argues that Plaintiff's reliance on <u>McKown</u> is misplaced

because the ALJ here "specifically found that while Plaintiff may have been in special

education classes as a child, there was no evidence of onset of mental retardation before

age 22."  <u>Id.</u> at 11 (citing (R. 17)).  Citing <u>Muntzert v. Astrue</u>, 502 F. Supp. 2d 1148,

1157-58 (D. Kan. 2007); and <u>McKown</u>, 1993 WL 335788, at *3, the Commissioner

argues that there is no record evidence that "Plaintiff's IQ had remained the same since

7

before age 22."  Id.  He argues that, in light of the record evidence of Plaintiff's activities,

the ALJ's finding that Listing 12.05C is not met is proper.  Id.  The Commissioner

concludes his argument:  "There is no evidence in the record establishing onset of mental

retardation before age 22, and Plaintiff's ability to perform many daily activities,

including successfully performing a job, negates his argument that his impairment meets

the criteria for Listing 12.05C.  The ALJ's decision should be affirmed."  Id.

### A.     Legal Standard Applicable to Listing 12.05C

The "Listing of Impairments" describes the severity of certain impairments that the

Commissioner considers disabling.  20 C.F.R. §§ 404.1525(a), 416.925(a); see also, 20

C.F.R., Pt. 404, Subpt. P, App. 1.  If plaintiff's condition meets or medically equals the

severity of a listed impairment, his impairment is conclusively presumed disabling.

Williams, 844 F.2d at 751; see Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if

impairment "meets or equals one of the listed impairments, the claimant is conclusively

presumed to be disabled").  However, plaintiff "has the burden at step three of

demonstrating, through medical evidence, that his impairments 'meet all of the specified

medical criteria' contained in a particular listing."  Riddle v. Halter, No. 00-7043, 2001

WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting Sullivan v. Zebley, 493 U.S. 521,

530 (1990) (emphasis in Zebley)).

"The [Commissioner] explicitly has set the medical criteria defining the listed

impairments at a higher level of severity than the statutory standard.  The listings define

impairments that would prevent an adult, regardless of his age, education, or work

8

experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'"

<u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)).

The listings "streamlin[e] the decision process by identifying those claimants whose

medical impairments are so severe that it is likely they would be found disabled

regardless of their vocational background." <u>Yuckert</u>, 482 U.S. at 153. "Because the

Listings, if met, operate to cut off further detailed inquiry, they should not be read

expansively." <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

Listing 12.05 provides:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period:  i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; Or

B. A valid verbal, performance, or full scale IQ of 59 or less; Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or

      3.      Marked difficulties in maintaining concentration, persistence, or pace; or

      4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.05.

Listing 12.05 is somewhat different than the other listings for mental disorders. Id., § 12.00A. The listing contains a diagnostic description of mental retardation (introductory paragraph) and four sets of criteria describing listing-level severity (Paragraphs A through D). 20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05(A-D). Paragraphs A through D provide four distinct and independent ways in which an individual having significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period might satisfy the criteria of Listing 12.05. Id.; McKown v. Shalala, No. 93-7000, 1993 WL 335788, *1 (10th Cir. Aug. 26, 1993). To meet the listing, a claimant must show that his condition satisfies both the diagnostic description of mental retardation and any one of the four severity criteria. Id., § 12.00A.

The regulations provide that where verbal, performance, and full scale IQ scores are derived from a test, the lowest score of the three will be used when considering Listing 12.05. 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00D(6)(c). If the claimant has an additional physical or mental impairment(s) which is "severe" within the meaning of 20 C.F.R. §§ 404.1520(c), 416.920(c), it will be considered to impose an additional and significant work-related limitation of function satisfying that criterion of Listing 12.05C.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(A); see also, Hinkle v. Apfel, 132 F.3d 1349, 1352-53 (10th Cir. 1997) (reaching the same conclusion before the regulations were changed in 2000 to specify the equivalence between "severe" impairments and "additional and significant work-related limitation of function."). Based upon the principles discussed above, to meet or equal Listing 12.05C, a claimant must show all three criteria are met: (1) evidence of onset of mental retardation before age twenty-two, (2) a valid IQ score of 60 through 70, and (3) a severe physical or mental impairment in addition to mental retardation.

### B.    The ALJ's Step Three Analysis

In his step two discussion of Plaintiff's severe impairments, the ALJ summarized Dr. Mintz's report regarding Plaintiff's mental impairments:

> Stanley Mintz, Ph.D., performed a mental status examination of the claimant on October 22, 2008. The claimant reported being a slow learner, attending special education in school and having some memory loss and anxiety. The psychologist noted that the claimant's thought processes were not fully logical, coherent or organized and he exhibited some confusion and disorientation due to lowered intellectual functioning. Dr. Mintz further opined that the claimant functioned within the mild mentally retarded range, as his verbal abstraction ability was very limited. On the Wechsler Adult Intelligence Scale-III, the claimant scored a Full Scale I.Q. of 64, Verbal I.Q. of 65 and Performance I.Q. of 70. The doctor indicated that the claimant was able to understand very simple, but not intermediate or complex instructions, and he had limited concentration capacity. The claimant was diagnosed with generalized anxiety disorder with panic attack symptoms and mild mental retardation. He was assessed a Global Assessment of Functioning of 55. (Exhibit 5F) [(R. 273-75)].

(R. 15-16).

The ALJ provided the following analysis at step three of the sequential process, and found that Plaintiff's condition does not meet or equal the severity of any Listed Impairment:

> The undersigned has considered all the listings, especially relevant Listings 1.04 and 12.02.  However, the evidence does not establish the medical findings necessary to satisfy the criteria of these listings.  Under Listing 12.02, organic mental disorders refers to demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:  disorientation to time and place; memory impairment, perceptual or thinking disturbances; change in personality; disturbance in mood; emotional lability and impairment in impulse control; or loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels.  The evidence does not support the assessments and test scores indicated in Exhibit 5F [(R. 273-77)], so the opinions in this exhibit are given little weight.  The claimant testified at the hearing that he can do math and read with little difficulty.  He has had a driver's license and has been able to perform unskilled work in the past, indicating that he is not mentally retarded.  His past employer noted that he had no trouble performing the work duties or getting along with others, and in fact, declined a permanent position because he was moving.  (Exhibit 8E) [(R. 173-75).]  He also cooks, does laundry, uses public transportation, shops and performs household chores.  It is clear his adaptive functioning is much higher that [sic] his October 2008 IQ scores show, which further suggests the scores are invalid.  Moreover, the claimant reported to Dr. Fortune that he was in regular classes in school, not special education classes.  There is no evidence that the claimant was diagnosed with mild mental retardation before age 22.  In addition, the claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1:  mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. The claimant has the burden of proof at this step and has not met it.

(R. 16-17).

In his RFC assessment, the ALJ provided the following discussion regarding Plaintiff's adaptive functioning, his intelligence, and his mental abilities:

> The record indicates that the claimant's adaptive functioning is at a higher rate than his IQ scores show. His daily living activities are not that limited. He is able to live independently and perform even some semi-skilled work in the past, which is inconsistent with even borderline IQ. Further, the claimant's past employer indicated that the claimant had no difficulty performing job duties in a timely manner, understanding and following directions, concentrating adequately, getting along with others, and learn [sic] new tasks within an acceptable time frame. (Exhibit 8E) [(R. 173-75).] In addition, even Dr. Mintz, who indicated the claimant functioned in the mild mentally retarded range's low I.Q. scores were valid [sic], suggested that the claimant could perform simple work. (Exhibit 5F) [(R. 273-77).] Accordingly, the undersigned finds the claimant's low average I.Q. does not prevent the claimant from performing all work activities, but he could do simple work.

(R. 18).

### C.    Analysis

Neither the parties' arguments nor the Commissioner's decision reflects an analysis that is based upon a proper understanding of Listing 12.05. The court begins by discussing the context of the Listing. As discussed above, Listing 12.05 requires that in every case a claimant seeking to meet that listing must establish that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App. 1 §12.05 (introductory paragraph) (described in § 12.00A as the "diagnostic description for mental

retardation").  No one may be found to meet or medically equal Listing 12.05 whose

condition does not satisfy this diagnostic description.  Id. at § 12.00A.

Paragraphs A through D of Listing 12.05 contemplate that mental retardation may

be presumptively disabling in four distinct ways.  Listing 12.05A contemplates a situation

in which mental retardation results in dependance upon others for personal needs and an

inability to follow directions.  Listing 12.05B contemplates a situation in which

intelligence testing establishes that an individual is more than mildly mentally retarded.

Listing 12.05B presumes an individual with mental retardation and a valid IQ score of 59

or below is disabled.  According to the American Psychological Ass'n, Diagnostic and

Statistical Manual of Mental Disorders 42 (4th ed., Text Revision 2000) ("DSM-IV-TR"),

IQ levels in the range of 50-55 to approximately 70 are described as "Mild Mental

Retardation," whereas IQ levels below 50-55 are described as "Moderate," "Severe," or

"Profound" Mental Retardation.  Id.  In light of the Diagnostic and Statistical Manual of

Mental Disorders, Listing 12.05B represents a policy decision by the SSA that all

individuals (provided they meet the diagnostic description for mental retardation) with

valid IQ scores placing them in an area of  "Moderate," "Severe," or "Profound" Mental

Retardation are conclusively presumed to be disabled.  Listing 12.05C contemplates the

situation of an individual who is Mildly Mentally Retarded, but is conclusively presumed

disabled because he also has "a physical or other mental impairment imposing an

additional and significant work-related limitation of function."  Listing 12.05D

contemplates the situation of an individual who is Mildly Mentally Retarded, but is

14

conclusively presumed disabled because his Mild Mental Retardation results in "marked" limitations or repeated episodes of decompensation in at least two of the four broad mental functional areas identified by the Commissioner.

The Commissioner, in promulgating Listing 12.05C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits.  Brown v. Sec'y of Health and Human Servs., 948 F.2d 268, 270 (6th Cir. 1991).  DSM-IV-TR describes mild mental retardation thus:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable."  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR 43 § 317.00 (emphases added).

DSM-IV-TR and the regulations in Listing 12.05C and Listing 12.05D assume many mildly mentally retarded individuals will be able to work.  The regulations account for the fact that some may become unable to work in two ways.  Listing 12.05D expresses the understanding that certain individuals will be unable to work because their mild mental retardation results in "marked" limitations or repeated episodes of decompensation

15

in at least two of the four broad mental functional areas.  20 C.F.R., Pt. 404, Subpt. P,

App. 1, § 12.05D(1-4).  This listing implies that such an individual will be able to work

unless or until his mild mental retardation results in the marked limitations or repeated

episodes of decompensation.  Listing 12.05C expresses the understanding that certain

mildly mentally retarded individuals will be unable to work because they also have "a

physical or other mental impairment imposing an additional and significant work-related

limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  This listing

implies that such an individual will be able to work unless he has, or until he develops, a

severe physical impairment or an additional severe mental impairment.

The decision suggests, and the Commissioner argues that the ALJ found, that

Plaintiff did not meet Listing 12.05C because he did not meet his burden to prove

"deficits in adaptive functioning initially manifested during the developmental period:

i.e., the evidence demonstrates or supports onset of the impairment before age 22."  The

court finds that substantial evidence in the record does not support the ALJ's finding in

this respect.

First, the court notes that the ALJ twice characterized Plaintiff's testimony in a

manner that is not supported by the record.  He stated that Plaintiff "testified . . . that he

can do math and read with little difficulty" (R. 16), and that Plaintiff "reported to Dr.

Fortune that he was in regular classes in school, not special education classes."  (R. 17).

The record reveals that when the ALJ asked Plaintiff, "Can you read?," Plaintiff

responded, "Yeah, I can read a little bit.  I don't spell very good."  (R. 27) (emphasis

16

added).  Plaintiff's attorney later followed-up on the issue.  "Okay.  Now, reading and writing and arithmetic.  You can read?"  (R. 31).  Plaintiff responded, "I can read <u>a little bit</u>."  <u>Id.</u> (emphasis added).  Thereafter the following dialogue ensued:

> Q.    Can you read a newspaper?
>
> A.    No, I couldn't read a whole newspaper.
>
> Q.    Not a whole newspaper, but an article out of a newspaper.
>
> A.    Like maybe I could read a horoscope, some of those.
>
> Q.    Okay.
>
> A.    Look at the weather.  That's about all I do.

(R. 31).  The ability to read "a little bit," to look at the newspaper's weather forecast, and to read a horoscope in the newspaper cannot fairly be characterized as testimony that Plaintiff can "read with little difficulty."  The record does not support that finding.

The ALJ's finding that Plaintiff "reported to Dr. Fortune that he was in regular classes in school, not special education classes," fares only slightly better.  As the finding suggests, Dr. Fortune included in the "Social History" portion of his report that Plaintiff "has 12th grade education in regular classes."  (R. 324).  While there is no indication that Dr. Fortune manufactured this information, there is also no indication that Plaintiff specifically stated that he was not in special education classes.  The court can imagine a conversation such as this:

> Dr. Fortune:  How did you do in school.
>
> Plaintiff:    OK.  I graduated.

17

From such a conversation, Dr. Fortune, who was evaluating Plaintiff's physical condition, and not his mental condition, might see no need for further inquiry, and might legitimately conclude that Plaintiff has a 12th grade education in regular classes. The point here is not to pretend or to speculate regarding what Plaintiff specifically told Dr. Fortune or what Dr. Fortune specifically asked Plaintiff. The point is that neither this court nor the ALJ can know from Dr. Fortune's report whether Plaintiff told Dr. Fortune that he was not in special education classes. From Dr. Fortune's report, it might be appropriate to suggest that Plaintiff "reported to Dr. Fortune that he was in regular classes in school." However, even that fact is not particularly probative in the circumstances. The further finding, however, that Plaintiff reported he was "not [in] special education classes," is simply not supported by the record.

The decision indicates the ALJ found that Plaintiff did not show mild mental retardation before age twenty-two because he could do math and read; he lived independently, and had a driver's license; he performed unskilled work and some semi-skilled work in the past; his previous employer stated he had no trouble performing work duties, concentrating adequately, understanding and following directions, learning new work tasks within an acceptable time frame, or getting along with others; he cooks, does laundry, uses public transportation, shops and performs household chores; and even Dr. Mintz suggested he could perform simple work; all of which makes it "clear his adaptive functioning is much higher tha[n] his October 2008 IQ scores show." (R. 17, 18). As the court's discussion of Mild Mental Retardation above demonstrates, none of these

activities establish that Plaintiff is not mildly mentally retarded, or that he was not mildly mentally retarded before age twenty-two.

The facts that an individual lives and functions independently, is able to work, and has attended schooling (even beyond high school) have been held in several cases to be facts which are not inconsistent with mild mental retardation. Markle v. Barnhart, 324 F.3d 182 (3rd Cir. 2003) (obtained GED, employed painting, wallpapering and cutting grass, able to use judgment, function independently, work well with others, and maintain attention and concentration); Morales v. Apfel, 225 F.3d 310, 318 (3rd Cir. 2000) (work as a landscaper, laborer and packing line worker); Brown, 948 F.2d at 270 (could follow a road atlas and had worked as a truck driver); McKown, 1993 WL 335788 (graduated from high school and had spent two semesters in college); Nieves v. Sec'y of Health and Human Servs., 775 F.2d 12, 14 (1st Cir. 1985) (worked as a seamstress). Because such activities are consistent with mild mental retardation, as explained above and in DSM-IV-TR, they cannot demonstrate a level of adaptive functioning that is higher than IQ scores which are also consistent with mild mental retardation. Listing 12.05C accommodates such activities, and anticipates that a mildly mentally retarded individual will be able to perform all of these activities and will also be able to perform substantial gainful activity unless or until he develops another severe mental or physical impairment. Contrary to the ALJ's assertion, these activities do not indicate adaptive functioning to a higher degree than would be indicated by IQ scores between 60 and 70 as contemplated by Listing 12.05C. Further, the ALJ's statement that the performance of semi-skilled work "is

inconsistent with even borderline IQ" (valid IQ scores of at least 71), is contrary to the cases cited above, and is contrary to the DSM-IV-TR as discussed above.  Moreover, the ALJ cites to no legal, medical, or psychological authority for that proposition, and the court is unaware of, and unable to locate, such authority.

While the ALJ's assertion that "There is no evidence that the claimant was diagnosed with mild mental retardation before age 22," is literally correct, the implied further finding that there is no evidence that mild mental retardation (or deficits in adaptive functioning) was first manifested before age twenty-two (or during the developmental period) is not supported by the record.  As the ALJ asserts, the record contains no evidence that Plaintiff was diagnosed with mild mental retardation before age twenty-two.  However, even that shortcoming might be attributed to the ALJ's failure to fully develop the record as to this relevant issue.

> The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.  This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented.  The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.

Cowan v. Astrue, 552 F.3d 1182, 1187 (10th Cir. 2008) (quoting Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993) (citations, quotations, and brackets omitted).  Here, if it was necessary to seek Plaintiff's school record to determine if Plaintiff attended special education classes and to determine if there was evidence of

mild mental retardation before age twenty-two, it was the ALJ's duty to make that inquiry.

Moreover, the record contains evidence of at least three facts suggesting Plaintiff had mild mental retardation before age twenty-two.  First, Plaintiff's testimony that he attended special education classes is at least some evidence supporting an inference of mild mental retardation before age twenty-two.  Second, Dr. Mintz's diagnosis of mild mental retardation is direct evidence of mild mental retardation before age twenty-two. The Diagnostic and Statistical Manual of Mental Disorders identifies three criteria necessary to a diagnosis of mental retardation.  DSM-IV-TR 41 (Diagnostic Features) ("The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning . . . (Criterion B).  The onset must occur before age 18 years (Criterion C).").  One of the criteria is that onset must occur before 18.  Id.  In diagnosing Plaintiff with Mild Mental Retardation, and in light of DSM-IV-TR, Dr. Mintz apparently found that onset of Plaintiff's mental retardation was before age 18.  Finally, the fact that Plaintiff's current IQ is 70 and below in each score recorded by intelligence testing is evidence supporting an inference of mild mental retardation before age twenty-two.

IQ is relatively constant through life and an IQ score after age twenty-two constitutes evidence of an individual's IQ being equivalent thereto before age twenty-two. Luckey v. Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) ("in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed

21

that the claimant's IQ had remained relatively constant."); Sird v. Chater, 105 F.3d 401

(8th Cir. 1997) (citing Luckey); and Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th

Cir. 2001) (adopting a presumption that IQ remains constant absent evidence of a change

in intellectual functioning)).  The Tenth Circuit has not addressed the issue whether

mental retardation may be presumed to have manifested during the developmental period.

However, it has noted that circuit courts have liberally construed the early manifestation

requirement whereby a claimant "is not required to affirmatively prove that he was

mentally retarded prior to reaching the age of twenty two so long as there was no

evidence that claimant's IQ had changed."  McKown, 1993 WL 335788, at *3.

 Plaintiff has presented sufficient evidence of onset before age twenty-two that the

ALJ may not merely reject that evidence without pointing to record evidence which is to

the contrary or without providing a sufficiently strong explanation of why all of that

evidence together is not persuasive.

 Although the ALJ accorded "some weight" to the opinions of the state agency

psychologist, Dr. Adams, and Dr. Adams opined that there was "[n]o evidence of MR

prior to 22" (R. 290), and that Plaintiff's activities, adaptive functioning, and mental

status exam suggest higher functioning than the IQ scores (R. 301), the ALJ did not

explain how (or even if) he determined that the opinion of Dr. Adams, who merely

reviewed the record, was worthy of greater weight than the opinion of Dr. Mintz, who

examined and tested Plaintiff.  In fact, the ALJ did not even discuss Dr. Adams's opinions

other than to state that he gave them "some weight" because "they are generally

22

supported by the overall record, the claimant's lack of mental health treatment and his

work history." (R. 18). As discussed above, Dr. Adams's opinion does not appear to be

supported by the overall record or by Plaintiff's work history. And, the court is at a loss

to see how a lack of mental health treatment supports a finding that Plaintiff's mental

retardation did not begin before age twenty-two. The court is unaware of any authority

for the proposition that mental health treatment is an appropriate response to mental

retardation. Moreover, there is no discussion in the decision of how Dr. Adams's opinion

can be accorded weight in light of the DSM-IV-TR, the regulations, and the case law

discussed above. Finally there is no discussion of how Dr. Adams's opinion can be

accepted in light of the evidence discussed above that the onset of Plaintiff's mental

retardation was before age twenty-two.

The ALJ did not apply the correct legal standard to evaluate whether Plaintiff's

mental condition meets or medically equals the severity of Listing 12.05C. Moreover, the

court is unable to find substantial record evidence supporting the findings made. Remand

is necessary for the Commissioner to properly apply the legal standard for evaluating

Listing 12.05C, as discussed above.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is

REVERSED, and that judgment shall be entered pursuant to the fourth sentence of 42

U.S.C. § 405(g) REMANDING the case for further proceedings consistent with this

opinion.

23

Dated this 26th day of June 2012, at Kansas City, Kansas.

    s:/ John W. Lungstrum

    **John W. Lungstrum**
    **United States District Judge**